UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DANA S. CANNON,
      Petitioner,

vs.                                                  Case No.:  4:15cv404/WS/EMT

MARK S. INCH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Dana S. Cannon (Cannon) filed a counseled habeas petition under 28 U.S.C. § 2254 (ECF No. 1).  On February 18, 2016, the court stayed this case pending final disposition of Cannon's state post-conviction appeal (*see* ECF No. 17). On August 5, 2019, Cannon notified the court that her state post-conviction appeal was final (*see* ECF No. 32).  On February 14, 2020, Respondent (the State) filed an answer to the § 2254 petition and relevant portions of the state court record (ECF No. 42).  Cannon filed a reply on July 14, 2020 (ECF No. 54).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the

disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases. It is further the opinion of the undersigned that Cannon is not entitled to federal habeas relief.

## I.   RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 42).[1]  Cannon was charged in the Circuit Court in and for Leon County, Florida, Case No. 2010-CF-1696, with two counts of shooting into or within a building (Counts I and II) and one count of aggravated assault with a firearm (Count III) (ECF No. 42-1 at 67 (Second Amended Information)).  On October 13, 2011, Cannon and the State entered a written plea agreement (Plea Agreement) (ECF No. 42-1 at 125–26 (Plea Agreement)).  Cannon agreed to enter a no contest plea to the charges, and the State agreed to waive any mandatory minimum prison sentence (*id.*).  The court held a plea hearing the same day and, following a colloquy, accepted Cannon's plea as freely and voluntarily entered (*see* ECF No. 42-2 at 31–39 (transcript of plea hearing)).

The court held a sentencing hearing on December 15, 2011 (ECF No. 42-2 at 40–123 (transcript of sentencing hearing)).  The parties presented testimony from

---

[1] Citations to the state court record refer to the document numbers and page numbers assigned by the court's electronic filing system.

witnesses and argument (*id.*).  The court adjudicated Cannon guilty and sentenced her to a "split" sentence of five years in prison followed by two years of community control followed by eight years of probation on Count I (ECF No. 42-2 at 136–37 (transcript of sentencing hearing); ECF No. 42-1 at 130–34 through ECF No. 42-2 at 1–6 (Judgment)).  As to Count II, the court sentenced Cannon to fifteen years of probation, to run consecutively to the sentence on Count I (*id.*).  As to Count III, the court sentenced Cannon to five years in prison, to run concurrently with the sentence on Count I (*id.*).  Cannon filed a notice of appeal but subsequently voluntarily dismissed the appeal (ECF No. 42-2 at 16–17 (notice of appeal), 141–42 (notice of voluntary dismissal)).

On May 30, 2012, Cannon filed a counseled motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (ECF No. 42-2 at 173–84 (Rule 3.850 motion)).  The court held an evidentiary hearing on February 1, 2013 (ECF No. 42-7 at 63–350 (transcript of evidentiary hearing)).  After the hearing, Cannon supplemented her Rule 3.850 motion with an additional claim (ECF No. 42-2 at 228–46).  The court held a second evidentiary hearing on November 25, 2013 (ECF No. 42-2 at 306 through 42-3 at 41 (transcript of continued evidentiary hearing)).  The circuit court denied Cannon's Rule 3.850 motion in an order rendered on May 23, 2014 (ECF No. 42-3 at 58–71

(order)).  Cannon appealed the decision to the Florida First District Court of Appeal (First DCA), Case No. 1D14-2625 (ECF No. 42-7 at 365–420 (initial brief)).  On May 13, 2015, the First DCA affirmed the lower court's decision per curiam without written opinion (ECF No. 42-8 at 53 (decision)).  *Cannon v. State*, 166 So. 3d 768 (Fla. 1st DCA 2015) (Table).  The mandate issued July 10, 2015 (ECF No. 42-8 at 62 (mandate)).

Cannon's counsel commenced this federal habeas action on August 17, 2015 (ECF No. 1).

On December 3, 2015, Cannon filed a motion to set aside the circuit court's order denying the Rule 3.850 motion (ECF No. 42-8 at 1–7 (motion)).  The circuit court denied the motion on December 9, 2015 (ECF No. 42-8 at 75–79 (order)).  Cannon appealed the decision to the First DCA, Case No. 1D16-93 (ECF No. 42-8 at 114–33 (initial brief)).  On December 16, 2016, the First DCA reversed the lower court's decision and remanded the case to the lower court with instructions that another judge treat the motion as a Rule 3.850 motion and "proceed accordingly" (ECF No. 42-8 at 171–78 (decision)).  *Cannon v. State*, 206 So. 3d 831 (Fla. 1st DCA 2016).  The mandate issued January 4, 2017 (ECF No. 42-8 at 180 (mandate)).

On remand, the circuit court (with a different judge presiding) held an evidentiary hearing on February 16, 2018 (ECF No. 42-14 at 57–131 (transcript of

evidentiary hearing)).  On March 16, 2018, the circuit court denied Cannon's motion to set aside the previous order denying the Rule 3.850 motion (ECF No. 42-14 at 50–53 (order)).  Cannon appealed the decision to the First DCA, Case No. 1D18-1626 (ECF No. 42-14 at 135–88 (initial brief)).  The First DCA affirmed the lower court's decision on July 9, 2019 (ECF No. 42-14 at 225–27 (opinion)).  *Cannon v. State*, 275 So. 3d 802 (Fla. 1st DCA 2019).  The mandate issued July 30, 2019 (ECF No. 42-14 at 229 (mandate)).

During the pendency of the Rule 3.850 proceedings, Cannon filed a motion to modify her community control in the state circuit court (ECF No. 42-13 at 169–75 (motion)).  On February 8, 2016, the court granted the motion in part, modifying Cannon's sentence on Count I from two years of community control followed by eight years of probation, to a term ten years of probation with no community control (*id.* at 267–68 (order)).  Cannon was released from the incarceration portion of her sentence on March 9, 2016, and has been serving her term of probation ever since.

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United

States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537

U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"  *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . .  because it was meant to be." *Richter*, 562 U.S. at 102.  The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no further.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment).  As a condition for

> obtaining habeas corpus from a federal court, a state prisoner must
> show that the state court's ruling on the claim being presented in federal
> court was so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any possibility
> for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

## III.   CANNON'S CLAIMS

**A.   Ground One:  "Defense counsel rendered ineffective assistance of counsel by failing to properly investigate this case and failing to properly advise Petitioner Cannon that she had valid defenses to the charges in this case.  Defense counsel was further ineffective for failing to retain experts to review this case in order to evaluate potential defenses."**

Cannon alleges defense counsel was ineffective for failing to investigate the case and advise her that she had valid defenses to the charges, i.e., a defense of self-

defense to the aggravated assault with a firearm charge, and a defense of accident to the shooting into or within a building charges (ECF No. 1 at 22–31).

With respect to counsel's alleged failure to investigate, Cannon asserts counsel should have investigated the prior history of Michael Stubbs, the victim of the aggravated assault with a firearm, specifically, Stubbs' history of abusing women, including Cannon, and his history of being fired from his position as a law enforcement officer for perjury, witness tampering, immoral acts, being untruthful, and violating an injunction obtained by Cannon against him (ECF No. 1 at 22–23). Cannon asserts she provided this background material on Mr. Stubbs to defense counsel's paralegal at the Musca Law Firm (*id.* at 24).

Cannon asserts defense counsel also failed to investigate her own version of the events regarding the night in question (ECF No. 1 at 23–25, 28). Cannon asserts she typed a statement of her version of events and provided it to the Musca Law Firm, which was the first time she "could provide a version of events that was free from Mr. Stubbs' influence" (*id.* at 23, 28). In her version, Cannon explained that Mr. Stubbs was attacking her with a look of rage in his eyes; she grabbed her gun to keep him from entering her bedroom; and she did not intentionally discharge her gun, rather, the gun discharged when Stubbs "jumped" on her and put his hands on the gun (*id.* at 23–24). Cannon also asserts defense counsel failed to sit down with

her and review the police reports, crime scene photographs, deposition transcripts, and 911 transcripts (*id.* at 23–25).

Additionally, Cannon alleges defense counsel should have consulted a mental health expert and a forensic reconstructionist (ECF No. 1 at 24–28). Cannon alleges consultation with a mental health expert, such as Dr. Jill Ricke who testified at the post-conviction evidentiary hearing, would have revealed that Cannon had been diagnosed with PTSD as a result of her abusive relationship with Mr. Stubbs and was being treated for bipolar disorder and borderline personality disorder (*id.* at 24–27). Cannon alleges her PTSD diagnosis would have demonstrated she was completely justified in arming herself with a firearm when Mr. Stubbs attempted to enter her bedroom, which would have been a complete defense to the aggravated assault charge (*id.* at 25–26). Cannon alleges Dr. Ricke's testimony also would have explained that Cannon was being "controlled" by Stubbs when police arrived at the scene, thus explaining why she did not explain "the whole story" to police (*id.* at 26–27).

Cannon alleges a forensic reconstructionist, such as Christopher Stewart who testified at the evidentiary hearing, would have revealed that forensic evidence from the scene was inconsistent with Mr. Stubbs' version of the events and consistent with the gun discharging inside Stubbs' bedroom after a struggle (ECF No. 1 at 28).

Cannon alleges this investigation would have revealed that she had valid defenses of justification/self-defense (to the aggravated assault charge), and accidental discharge (to the shooting into or within a building charges) (ECF No. 1 at 22, 28). She contends if defense counsel had properly advised her that she had valid defenses, she would not have entered a no contest plea and instead would have insisted on going to trial (*id.* at 30). Cannon contends the state court's rejection of her ineffective assistance of trial counsel (IAC) claim was contrary to and an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), and that the state courts' rulings were based upon an unreasonable determination of the facts in light of the evidence contained in the state court record (*id.* at 33–48).

The State concedes Cannon exhausted this claim in state court by presenting it in her Rule 3.850 motion and post-conviction appeal (*see* ECF No. 9–10). The State contends the state court's adjudication of Cannon's claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 20–37).

### 1.    Clearly Established Federal Law

"A reviewing federal court may set aside a state court guilty plea only for failure to satisfy due process." *Stano v. Dugger*, 921 F.2d 1125, 1141 (11th Cir. 1991) (en banc) (citing *Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969)). The Due

Process Clause requires that a guilty plea be entered knowingly and voluntarily. *Boykin*, 395 U.S. at 243 n.5; *see also Bousley v. United States*, 523 U.S. 614, 618 (1998). In determining the validity of a plea to a criminal charge, a plea of *nolo contendere* stands on equal footing with a guilty plea. *North Carolina v. Alford*, 400 U.S. 25, 35–36 (1970); *Hudson v. United States*, 272 U.S. 451 (1926); *see also Florida v. Royer*, 460 U.S. 491, 495 n.5 (1983) ("Under Florida law, a plea of nolo contendere is equivalent to a plea of guilty."). "A guilty plea is an admission of criminal conduct as well as the waiver of the right to trial." *Finch v. Vaughn*, 67 F.3d 909, 914 (11th Cir. 1995) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748. Accordingly, in the context of a guilty plea, the standard for determining the validity of the plea is "whether the plea represents a voluntary intelligent choice among the alternative courses open to the defendant." *Alford*, 400 U.S. at 31; *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). The assistance of counsel received by a defendant is relevant to the question of whether a defendant's guilty plea was knowing and intelligent *insofar*

*as it affects the defendant's knowledge and understanding. See McMann v. Richardson*, 397 U.S. 759, 770–71 (1970).

The advantages of entering a plea may be secured "only if dispositions by guilty plea are accorded a great measure of finality." *Blackledge v. Allison*, 431 U.S. 63, 71 (1977). Recognizing that a prisoner often "has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea," courts accord great deference to a defendant's statements during a plea colloquy and are reluctant to allow a defendant to go behind his own sworn testimony. *Id.*

> [T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Id.* at 73–74 (citations omitted).

The two-part test articulated in *Strickland*, applies to claims that counsel was ineffective during the plea process. *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (applying *Strickland*'s two-part test to habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer); *Missouri v. Frye*, 566 U.S. 134, 140, 147–51 (2012) (applying *Strickland*'s two-part test to habeas petitioner's claim that counsel was ineffective for failing to communicate a prosecution plea offer

before it lapsed); *Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (applying *Strickland*'s two-part test to defendant's challenge to his guilty plea based on ineffective assistance of counsel). To obtain relief under *Strickland*, a petitioner must establish that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

The focus of *Strickland*'s performance prong in a plea situation is "whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56–57 (quoting *McMann*, 397 U.S. at 771). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984). "To impart such an understanding to the accused, counsel must, after making an independent examination of the facts, circumstances, pleadings and laws involved, offer his informed opinion as to the best course to be followed in protecting the interests of his client. *Id*. (citing *Walker v. Caldwell*, 476 F.2d 213, 217 (5th Cir. 1973)).

"Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused regarding the plea. *Stano*, 921 F.2d at 1150–51 (citing *McMann*, 397 U.S. at 774; *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); *Hill*, 474 U.S. at 56).

To meet *Strickland*'s prejudice prong in a plea situation, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. "It is not enough for [the petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate a reasonable probability that, but for counsel's errors, she would not have pleaded guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 58–59. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

In *Premo v. Moore*, the Supreme Court elaborated on the importance of strict

adherence to the *Strickland* standard in the plea context:

> Plea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks. The opportunities, of course, include pleading to a lesser charge and obtaining a lesser sentence, as compared with what might be the outcome not only at trial but also from a later plea offer if the case grows stronger and prosecutors find stiffened resolve. A risk, in addition to the obvious one of losing the chance for a defense verdict, is that an early plea bargain might come before the prosecution finds its case is getting weaker, not stronger. The State's case can begin to fall apart as stories change, witnesses become unavailable, and new suspects are identified.
>
> These considerations make strict adherence to the *Strickland* standard all the more essential when reviewing the choices an attorney made at the plea bargain stage. Failure to respect the latitude *Strickland* requires can create at least two problems in the plea context. First, the potential for the distortions and imbalance that can inhere in a hindsight perspective may become all too real. The art of negotiation is at least as nuanced as the art of trial advocacy, and it presents questions further removed from immediate judicial supervision. There are, moreover, special difficulties in evaluating the basis for counsel's judgment: An attorney often has insights borne of past dealings with the same prosecutor or court, and the record at the pretrial stage is never as full as it is after a trial. In determining how searching and exacting their review must be, habeas courts must respect their limited role in determining whether there was manifest deficiency in light of information then available to counsel. *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). AEDPA compounds the imperative of judicial caution.
>
> Second, ineffective assistance claims that lack necessary foundation may bring instability to the very process the inquiry seeks to protect. *Strickland* allows a defendant "to escape rules of waiver and forfeiture," *Richter*, 562 U.S. at 105, 131 S. Ct. 770. Prosecutors must

have assurance that a plea will not be undone years later because of infidelity to the requirements of AEDPA and the teachings of *Strickland*. The prospect that a plea deal will afterwards be unraveled when a court second guesses counsel's decisions while failing to accord the latitude *Strickland* mandates or disregarding the structure dictated by AEDPA could lead prosecutors to forgo plea bargains that would benefit defendants, a result favorable to no one.

Whether before, during, or after trial, when the Sixth Amendment applies, the formulation of the standard is the same: reasonable competence in representing the accused. *Strickland*, 466 U.S. at 688, 104 S. Ct. 2052. In applying and defining this standard substantial deference must be accorded to counsel's judgment. *Id.* at 689, 104 S. Ct. 2052.

*Premo,* 562 U.S. 115, 124–26 (2011).

Professionally competent assistance includes a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 690–91. The Supreme Court has emphasized that only when counsel's choices are made after a "thorough investigation of law and facts relevant to plausible options" are those choices "virtually unchallengeable." *Id.* at 690. When, however, "strategic choices [are] made after less than complete investigation [they] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. Thus, at bottom, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances. . . ." *Id.* at 691. This means

that when a court assesses the attorney's decision not to investigate, it "must consider

. . . whether the known evidence would lead a reasonable attorney to investigate

further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

When a district court considers a habeas petition, the state court's findings of

historical facts in the course of evaluating an ineffectiveness claim are subject to the

presumption of correctness, while the performance and prejudice components are

mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting

*Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371

(2010). "Establishing that a state court's application of *Strickland* was unreasonable

under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations

omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both
> "highly deferential," and when the two apply in tandem, review is
> "doubly" so. The *Strickland* standard is a general one, so the range of
> reasonable applications is substantial. Federal habeas courts must
> guard against the danger of equating unreasonableness under *Strickland*
> with unreasonableness under § 2254(d). When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable. The
> question is whether there is any reasonable argument that counsel
> satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## 2.    Federal Review of State Court Decision

Cannon presented Ground One to the state court in her Rule 3.850 motion (ECF No. 42-2 at 173–84 (Rule 3.850 motion), 251–52 (amendments to Rule 3.850 motion)). The entire record of the state court proceedings is included in the federal habeas record (*see* ECF No. 42-2 at 169 through 42-7 at 520). The state circuit court held evidentiary hearings on Cannon's Rule 3.850 motion on February 1, 2013 and November 25, 2013.

At the first evidentiary hearing, Cannon presented testimony from Christopher Michael Stewart, a forensic engineer who was qualified as an expert in the area of reconstruction of trajectory of ballistics (ECF No. 42-7 at 84–88).[3] Mr. Stewart testified he reviewed the crime scene photos taken on May 29, 2010, the police report, the deposition testimony of Officer Donaldson, a written statement by Michael Stubbs, a written statement of Ms. White (the occupant of the neighboring apartment where one of the bullets entered), and Cannon's handwritten statement from January of 2012 (after Cannon's plea and sentencing and almost two years after the incident) (*id.* at 85). All of these materials were admitted as evidence at the evidentiary hearing (*see* ECF No. 42-3 at 101 through 42-4 at 5, 22–26, 28–31 (crime

---

[3] The court's description of the testimony adduced at the evidentiary hearing is not exhaustive. The fact that other testimony was provided but not included here does not mean that the court did not consider it.

scene photos admitted as State's Exhibit 6 and Defendant's Exhibit 1); ECF No. 42-3 at 75, 77–78 (incident report admitted as State's Exhibit 1); ECF No. 42-3 at 79–97 (Officer Donaldson's deposition transcript admitted as State's Exhibit 2); ECF No. 42-3 at 98–99 (Stubbs' statement admitted as State's Exhibit 3); ECF No. 42-3 at 100 (White's statement admitted as State's Exhibit 4); ECF No. 42-4 at 18–20 (Cannon's handwritten statement admitted as State's Exhibit 8).  Mr. Stewart testified he also was provided a diagram that Cannon prepared showing her "idea of where everything happened" (ECF No. 42-7 at 99).  Mr. Stewart testified he then prepared his own diagram illustrating his opinion of the trajectory of the two bullets that were fired on May 29, 2010, and the positions of Michael Stubbs and Cannon in Stubbs' bedroom (ECF No. 42-7 at 88).  Stewart's diagram was admitted into evidence in Defendant's Exhibit 1 (ECF No. 42-4 at 27 (Stewart's diagram)).  Stewart testified that his opinion with respect to the trajectory of the bullets was consistent with Cannon's later account, that the firearm discharged after Michael Stubbs moved toward her and attempted to take it away from her (ECF No. 42-7 at 90–91).

On cross-examination, Mr. Stewart admitted that when he prepared his diagram, he did not have any measurements of the sizes of the rooms or the items in the rooms (ECF No. 42-7 at 93–94, 100).  Mr. Stewart admitted that in formulating

his opinion, it would have been much more helpful to actually visit and view the crime scene (*id.* at 94–95). He testified that if he could have visited the crime scene, he would have gone into both rooms, taken "precise" measurements, and documented his measurements (*id.* at 95). Mr. Stewart also admitted that he did not know if the furniture was moved between the time of the shooting and the time the crime scene photos were taken (*id.* at 103, 105).

Cannon also presented testimony from Dr. Jill Ricke, a licensed psychologist (ECF No. 42-7 at 107). Dr. Ricke testified she specialized in treating people with Post Traumatic Stress Disorder (PTSD), including victims of domestic violence and "other type[s] of dating relationship violence," and she had been qualified as an expert in PTSD (*id.* at 108–09). Dr. Ricke testified she reviewed the background materials on Michael Stubbs admitted into evidence as Defendant's Exhibit 2 (ECF No. 42-4 at 31 through 42-6 at 73 (Stubbs' background materials)). Dr. Ricke testified she interviewed Cannon twice, and interviewed Cannon's daughter (ECF No. 42-7 at 112). Dr. Ricke testified that if she had been consulted by Cannon's defense counsel, she would have opined that Cannon suffered from PTSD, and that Cannon had a well-founded fear that Michael Stubbs was going to kill her and was thus was justified in arming herself with a firearm (*id.* at 119–20).

On cross-examination, the State's attorney asked Dr. Ricke if she would have

testified in support of a self-defense theory if she had testified at a trial in Cannon's

case (ECF No. 42-7 at 125–26).  Dr. Ricke answered:

> A.  She was just trying to get away from him.  I don't think—to
> me, acting in self-defense is you're defending yourself.  She was trying
> to get away from him.  So I don't think she was defending herself at all.
> She was just trying to get away.
>
> Q.  So your potential assistance at a trial would not be for a self-
> defense claim?
>
> A.  She did not want to hurt him.  She told me she did not want
> to hurt him.  She was victimized.  He attacked her.  She had the gun,
> not to hurt him, but to get him to leave.  She knew that if she had a gun
> pointed at him, he probably wouldn't do anything.  And he said he was
> going to leave, he just needed to pack some of his things.  And she said
> to me, once she saw that he didn't have a handgun in the back of his
> shorts, she was relieved that she was safe.  So she was uncocking the
> gun because she was afraid it would go off.
> . . . .
> Q.  So, your opinion would not be that she was acting in self-
> defense that night?
>
> A.  I think she was trying to survive and get away from him.
> . . . .
> Q.  So she wouldn't have been acting in self-defense when she
> fired the shot?
>
> A.  Well, I don't think she fired the shot.  So, I mean, to me, self-
> defense is that you do something to somebody else.
>
> Q.  Intentionally?
>
> A.  Yes, intentionally.

(ECF No. 42-7 at 129–31).  Dr. Ricke testified she had never testified for the defense in a criminal case regarding self-defense or involving a gun (*id.* at 138–39).

Dr. Ricke also testified on cross-examination that it would not be odd if the stories that Cannon and Michael Stubbs told police matched, if they were in the same room when they spoke to police (ECF No. 42-7 at 140).  Dr. Ricke testified that if Stubbs was "in and out" of the room when Cannon was talking to police, it would be odd if their stories matched (*id.*).[4]

On re-direct examination by Cannon's counsel, Dr. Ricke read from the sentencing transcript, where Cannon said that Stubbs was "in and out of the room" (ECF No. 42-7 at 143).  Dr. Ricke then changed her opinion and testified that Stubbs was "completely and absolutely controlling" Cannon when she spoke to Officer Donaldson (*id.*).  Dr. Ricke opined that Cannon was "absolutely justified" in arming herself with a firearm because she justifiably feared for her life (*id.* at 143, 145–46).

The court posed questions to Dr. Ricke:

> THE COURT:  And one question that I have, she is—you keep saying that she is in such fear for her life that she has to arm herself. Yet, she walks into his room, following him.  And at least as far as the

---

[4] Cannon asserts that Officer Donaldson confirmed in his deposition that Stubbs was in Cannon's presence during the interview (*see* ECF No. 1 at 8 n.14).  According to the deposition transcript, Officer Donaldson actually stated that Stubbs was "in and out of the room" when he (Donaldson) was speaking to Cannon (*see* ECF No. 42-3 at 88).  Officer Donaldson stated he confined Cannon to the living room, but Stubbs was "free to move around" and was "walking around" (*id.* at 85–86).

diagram and all that is concerned, had to walk past him at some point in time.  So, why didn't she just leave rather than going in his room?

THE WITNESS:  Well, she said she went in his room—she followed him to make sure that he didn't—that he was getting his things and he was going to leave.  And I think she probably—I don't know why she—but she told me that the reason she did start to leave is because she saw that he didn't have a gun.  But she followed him in there to make sure he would actually get his things and leave.

THE COURT:  Wouldn't it make more sense, if she was that afraid of him, to either stay in her bedroom and lock the door or when he turned his back and went into his bedroom bolt out the front door and go?

THE WITNESS:  You know, when you are in a traumatic situation, you don't always think very clearly.  So I don't know the answer to that.

THE COURT:  And if, in fact, he had abused her time and time again, and he turns his back and says, okay, I'm leaving, why would she believe him?  Why would she have any reason to believe him at that point in time and not, instead, consider the fact that he was going to abuse her again?

THE WITNESS:  Well, she wanted to believe him.  She wanted to—she still loved him.  She wanted to think that he was going to leave.  So she thought he was going to leave because he said he would and he went to get his things.

(ECF No. 42-7 at 150–51).

Dr. Ricke's testimony concluded with the following testimony:

Q [by the State's attorney].  And we are supposed to believe that without having a romantic relationship, without staying in the same bedrooms, with him not actually wanting to have a relationship, romantic relationship with her, and allowing her to sleep in a bedroom

with two loaded firearms, that this was truly a domestic violence situation the night that she armed herself with both of those firearms?

A  Yes, because he would allude to—whenever she would try to leave him, he would try to lure her back and say, well, I was hoping, I think we are working—we are working on getting back together.  So there was always that—that idea in her head.  And because she still loved him, she was hopeful.

Q.  And yet fearful because she was suffering from post traumatic stress?

A.  Yes, she was afraid of him.

(ECF No. 42-7 at 160).

Cannon testified at the evidentiary hearing.  Regarding the night of the shooting, Cannon testified that when she talked to Officer Donaldson, Michael Stubbs was "in the bedroom, back out, out the front door, which everything is right within eye and ear distance.  He was constantly there." (ECF No. 42-7 at 212). Cannon testified that Stubbs was giving her "a look like you know what I told you." (*id.* at 213).  Cannon testified that her account to Officer Donaldson was exactly the same as Stubbs' account, but she did not know that at the time (*id.*).

Cannon testified that when she retained the Musca Law Firm, her first attorney was Mr. Greenway (ECF No. 42-7 at 203).  Cannon testified she provided Greenway a typed description of her history with Michael Stubbs and the events that transpired

on the night of the shooting (*id.* at 202–03).  The typewritten document was admitted

as Defendant's Exhibit 3 (ECF No. 42-6 at 74–85 (Cannon's typed statement)).

Contrary to the well-accepted notion that a person's memory of an event

diminishes as time passes, Cannon's typed statement begins with the statement, "So

much more will come to my memory I know, but this is enough to get you started I

do believe." (ECF No. 42-6 at 75).  Among other matters, Cannon's typed statement

describes the night of the shooting (*id.* at 81–83).  She states she went to a bar and

drank "a couple of drinks, something called a Jolly Rancher" (*id.* at 81).  Cannon

states she went home at 2:00 a.m., when the bar closed (*id.*).  Cannon states she

awoke Mr. Stubbs, despite her knowledge that he "does NOT like to be woke [sic]

up!" (*id.*) (emphasis in original).  Cannon states she told Stubbs that she had "a few"

drinks (*id.*).  Cannon states an argument started (*id.*).  She states she went outside,

smoked a cigarette, and then went back into the apartment (*id.*).  Cannon states, "I

do NOT remember what happened, until I got to my door.  I do NOT know how, or

why the argument escalated to the point of what happened next" (*id.* at 82) (emphasis

in original).  Cannon's description of what transpires next is fairly consistent with

her testimony at the evidentiary hearing (*id.*).  In her typewritten statement, Cannon

states that once the officers arrived, they came inside the apartment, she sat down on

the couch, and Stubbs "went outside" to talk to the officers (*id.*).  Cannon states one

officer came back in and talked to her, and she told him what happened (*id.*). Cannon states the officer advised her of her rights, arrested and handcuffed her, and took her "out past Michael" (*id.*).

Back to Cannon's evidentiary hearing testimony, Cannon testified that when Mr. Greenway left the Musca firm (in October of 2010), Attorney Quisenberry took over her case (in March of 2011) (ECF No. 42-7 at 215). Quisenberry "never seemed to know what I was talking about" when Cannon asked him if he read certain documents (*id.* at 215, 217). Cannon testified that Attorney Quisenberry did not impart any information to her so that she could make a decision as to whether or not to accept a plea (*id.*). Cannon testified that Quisenberry never indicated to her that he had investigated any possible defenses or self-defense, and he never explained why she couldn't use that defense (*id.*). Cannon testified she was seeing a domestic violence counselor and signed a release for Quisenberry to obtain her counseling records, but he never obtained them (*id.* at 215–16). Cannon testified she made it clear to Attorney Quisenberry that she never discharged a firearm at any time that night, and she told him this "more than probably 20" times (*id.* at 216). Cannon testified that Attorney Quisenberry wanted her to apologize (apparently at the sentencing hearing) for discharging the firearm, but she refused to do so because, "I will not lie under oath" (*id.* at 216–17). Cannon then admitted that what she told

Officer Donaldson on the night of the shooting was not true, but she explained that she was not under oath at the time (*id.* at 217).

Cannon testified she met with Attorney Quisenberry every time she had a court appearance, and they had a number of telephone conversations (ECF No. 42-7 at 211–12, 221). She testified that Quisenberry never reviewed police reports, witness statements, crime scene photos, or Officer Donaldson's deposition transcript with her, even though she "constantly" asked him about these things (*id.* at 214, 219–20). Cannon testified she was "constantly finding stuff that I thought he would want to use" (*id.* at 222). She testified that Attorney Quisenberry would tell her to send it to him, but "then he never, ever responded back" (*id.*). Cannon then admitted that Quisenberry's paralegal contacted her and the two of them spent a day collecting background records on Michael Stubbs (Defense Exhibit 2) (ECF No. 42-7 at 222–23). Cannon testified that when she asked Attorney Quisenberry about the materials, he "acted as if he didn't know anything about it" (ECF No. 42-7 at 223). Cannon further testified that when she asked the Musca Law Firm for her file after her sentencing, her letter to Mr. Greenway was included in the file that she received, but none of the background materials on Michael Stubbs were included (*id.* at 203, 223). Cannon testified that "from day one," Attorney Quisenberry never discussed anything with her other than a plea (*id.* at 221). She testified she did not respect

Attorney Quisenberry when he told her that certain things were not relevant, but she "was still also thinking that he knew what he was talking about" (*id.* at 218).

Cannon then testified regarding the events on the night of the shooting. Cannon testified she went into her bedroom and tried to close the door, and Stubbs started pushing himself in (ECF No. 42-7 at 225). Cannon testified she put her hand in the center of his chest and pushed him, and Stubbs became enraged (*id.* at 225–26). Cannon testified she "kept trying to push him out and I couldn't" (*id.* at 226). She testified she reached behind the door, picked up a shotgun, and chambered a round (*id.*). She testified, "I just wanted—I wanted to get out. I wanted him to leave or I wanted to leave." (*id.*). Cannon testified that Stubbs took the shotgun from her, turned his back, and threw the shotgun on a couch nearby (*id.*). Cannon testified she ran to her dresser and grabbed her gun (*id.*). She testified that Stubbs returned, and she told him that she had a gun and he needed to leave (*id.*). Cannon testified Stubbs backed into his bedroom, and she stood in the doorway (*id.* at 227). She testified that Stubbs said, "I'll leave. Let me get my shirt" (*id.*). Cannon testified that Stubbs turned his back to her, and she noticed that the gun he usually carried in his waistband was not there (*id.*). Cannon testified that "as scared as I was of him I was more scared of holding a gun" (*id.*). Cannon testified she turned from Stubbs to "put the hammer down," and Stubbs "jumped" her (*id.*). Cannon testified that Stubbs put

his hands on her hands on the gun and it discharged (*id.* at 228–29). She testified, "I know for a fact his finger pulled that trigger through my finger" (*id.* at 229).

Cannon testified she recounted these events to Attorney Quisenberry, but he never discussed the defense of accidental discharge (ECF No. 42-7 at 230). She testified she told Quisenberry three or four times prior to sentencing that she did not fire the weapon, but "he would always slip and say, well, you fired the weapon" (*id.* at 230–31).

The attorney for the State questioned Cannon about previous statements she made under oath:

> Q. Ms. Cannon, you said you never lie under oath, correct?
>
> A. Not in court.
>
> Q. Okay. So you lie under oath, but just not in court?
>
> A. There was a time with the internal affairs report that I told exactly what happened and then two days later Michael come [sic] and threatened me to make it right. So I went back and they knew that I was not telling the truth.
>
> Q. And that's the internal affairs people at the Gadsden County Sheriff's office?
>
> A. Yes.
>
> Q. But, other than that, you don't lie under oath?
>
> A. No, ma'am.

Q.  Do you recall filing for an injunction in Gadsden County against Mr. Stubbs in 2009?

A.  Yes, ma'am, I did.

Q.  Do you recall filling out the petition for that injunction?

A.  Yes, ma'am.

Q.  Do you recall filing the notice of voluntary dismissal after you filled out that petition for injunction?

A.  Yes, ma'am.

Q.  And you recall that your petition was sworn to, correct, under oath?

A.  Yes, ma'am.

Q.  Do you recall in your notice of voluntary dismissal stating, "'I am dropping the injunction on Michael Stubbs.  I did not tell the truth.  He has never tried to hurt me in any way'"?

A.  Yes, ma'am.

Q.  And when you filed that notice of voluntary dismissal, that was also under oath?

A.  Yes, ma'am, it was.  It's the one I just told you about, because he threatened me.  He told me that I better make it right.  And, considering he walked through the injunction [sic] after two days, I knew that it wasn't going to stop him anyway.

Q.  So that was given to the Gadsden County Sheriff's office, that notice of voluntary dismissal?

A.  I guess so. I went to the Gadsden County Sheriff's office and filled it out.  Or I wrote whatever they told me to write.

Case No.:  4:15cv404/WS/EMT

Q.  Okay.  So you're saying the sworn document that you filed with the Gadsden County Clerk of Court was something the Gadsden County Sheriff's office told you to write?

A.  Yes, ma'am, because I wanted to drop the injunction.

What I said, you might not understand, but he walked through it [sic] after two days anyway.  He was at my house.  I said there wasn't no sense in having it.  He said make it right.  And that's what I did.

(ECF No. 42-7 at 232–34).

Cannon testified that Attorney Quisenberry was her fourth attorney (ECF No. 42-7 at 235–36).  She testified she hired Mr. Zelman and then Ryan Davis (*id.*).  Cannon testified she and Ryan Davis discussed possible self-defense and/or possible battered woman syndrome (*id.* at 236).  Cannon testified she fired Mr. Davis after four months and hired the Musca Law Firm, where she was first represented by Mr. Greenway and then Attorney Quisenberry (*id.*).  Cannon repeated her previous testimony that she and Quisenberry never discussed a defense even though she asked him "many times" what their plan was (*id.* at 239).  She repeated that the only thing Attorney Quisenberry talked about was the plea (*id.* at 237).

The State's attorney asked Cannon the straightforward question of whether she knew she was facing a 20-year mandatory minimum prison sentence in her case (ECF No. 42-7 at 240).  Cannon first responded, "no ma'am"; then said, "I had been told that"; and then said, "I honestly did not know what I was facing" (*id.*).  The

State's attorney asked Cannon, "And you knew that the State was also not going to

ask for a three-year minimum mandatory before you entered the plea, correct?" (*id.*

at 240–41). Cannon responded, "No, ma'am, not correct" (*id.* at 241). When it

became apparent that the State's attorney was going to impeach Cannon with her

statement during the plea hearing, Cannon preemptively explained:

> I apologize. I was extremely distraught. I don't know what was
> talked about. I was told to sign a piece of paper that I couldn't even
> read. I cried and I cried and I cried and I signed the paper. And I went
> in there and I honestly cannot tell you what was discussed.

(ECF No. 42-7 at 241).

The State's attorney then asked Cannon a straightforward question about her

testimony that Michael Stubbs had turned his back to her at her bedroom door after

he took the shotgun from her, and Cannon qualified her previous testimony:

> Q. Ms. Cannon, you testified that when Mr. Stubbs took the
> shotgun from you, he threw it on the couch and then he turned his back.
> Those were your words, correct?
>
> A. He did not turn his back all the way. He might have turned
> his side because where my door is, or was, the couch is right here on
> this wall. So he didn't have to go far. The couch was right there.
>
> Q. So when you used the word "turned his back" a few moments
> ago when Mr. Pumphrey was asking you questions, is that incorrect
> now?
>
> A. No, ma'am, it's not.
>
> Q. So he did turn his back?

A.  I don't know if he was— he was not completely his [sic] back on me at that point.

Q.  You had an opportunity when he did that to look to see if he had a firearm in his boxer shorts, didn't you?

A.  That's what I just said.  He was not—I don't—he wasn't turned all the way backwards.

Q.  And rather than looking to see if he was armed, you went ahead and got yourself another gun, didn't you?

A.  Yes, ma'am.

Q.  And you cocked the gun?

A.  Yes, ma'am.  I could not get to my purse or my keys or my cell phone.  And it's a two-story bedroom, so I had no place to go.

(ECF No. 42-7 at 252–53).

The State's attorney questioned Cannon about the police report, in which Officer Donaldson reported that Cannon told him she followed Stubbs into his room, fired a round through the bedroom wall, and then Stubbs attempted to take the gun away and it discharged a second time (*see* ECF No. 42-7 at 256).  Cannon denied that she told Donaldson that she fired any shots (*id.* at 256, 260).  The State's attorney questioned Cannon about certain statements attributed to her in the pre-sentence investigation report (PSI) prepared by Correctional Probation Senior Officer Jennifer Thurber, including Cannon's statement that she "fired a round not at him

[Stubbs] but near him" (*id.* at 258).[5]  Cannon acknowledged that she was interviewed

by Ms. Thurber, but denied that she ever said made that statement (*id.* at 259–60).

On re-direct examination, Cannon testified that Attorney Quisenberry never

showed her the PSI prior to sentencing (ECF No. 42-7 at 268).  Cannon testified that

during the plea colloquy, she answered the judge truthfully (*id.* at 270).  Cannon

testified she entered the plea based upon the advice of Attorney Quisenberry (*id.*).

The court asked Cannon a few questions, including the following:

> THE COURT:  Okay.  You testified also that you had money to hire experts and to pay for other testing and all to be done and that Mr. Musca or Mr. Quisenberry didn't do that.
>
> So my question is, if you are not getting any information, if you are not getting anything in your case, and the only thing that they're talking to you about is a plea, and you're unhappy with that because you want to assert self-defense, why didn't you hire another lawyer?
>
> THE WITNESS:  Because he said it wouldn't do me any good. I didn't know—if he says that it's not going to help, then I wanted him to try it.  I would rather him try it and fail.
>
> THE COURT:  So you have a lawyer here that you have no confidence in, that's not doing anything that you want him to do; yet, when he tells you don't hire another lawyer, you still believe him?  Is that what you're saying?
>
> THE WITNESS:  He didn't tell me not to hire another lawyer.

---

[5] The PSI was admitted into evidence as State's Exhibit 7 (*see* ECF No. 42-4 at 6–16).

THE COURT:  Well, you just told me that he told you it wasn't going to do any good if you hired another lawyer. Did you have a conversation with him?

THE WITNESS:  It wasn't going to do any good if we tried to fight the case.

THE COURT:  My question to you, ma'am, was did you ever talk to or try to hire another lawyer?

THE WITNESS:  No, sir.

THE COURT:  All right.  You're in front of Judge Fulford and you're going through the plea colloquy with Judge Fulford.  Your lawyer had not done anything in the case, had not put forward the defense that you wanted him to put forward, and you didn't believe that entering this plea was what you should do, that you should in fact go with a self-defense defense, but yet, in front of Judge Fulford, you didn't say any of that, did you?

THE WITNESS:  Sir, I honestly thought it was too late.

THE COURT:  Yes or no?

THE WITNESS:  No, sir.

(ECF No. 42-7 at 273–74).

Cannon's counsel asked follow-up questions, essentially pointing out that Judge Fulford had not asked Cannon those questions during the plea colloquy (ECF No. 42-7 at 274–75).  The State's attorney then elicited the following testimony from Cannon:

Q.  The question about your plea, Ms. Cannon, you indicated that you weren't sure whether you had been advised by Judge Fulford or

asked if you were advised of all of your defenses or happy, satisfied with your lawyer's assistance in the case. Had you been asked those questions, would you have said no?

      A. No, because he told me to say yes to every question and make it convincible.

      Q. So you would have again lied under oath?

      A. I wouldn't have called that lying. I was doing what I was told to do.

(ECF No. 42-7 at 277).

Attorney Quisenberry testified he worked as a prosecutor from 1988 to 2010 and conducted over 100 criminal jury trials (ECF No. 42-7 at 299). Quisenberry testified he went from the State Attorney's Office to the Musca Law Firm to handle criminal defense cases (*id.* at 299–300). Attorney Quisenberry testified he worked at the Tampa location of the Musca Law Firm (*id.* at 300). He testified that the Musca Law Firm's central office was in Naples (*id.*).

Attorney Quisenberry testified he was given Cannon's case in March of 2011, after Mr. Greenway left the Musca Law Firm (ECF No. 42-7 at 280–81). Attorney Quisenberry testified that Mr. Greenway "more or less" disappeared:

      A. I've tried to contact him. I've never actually spoken to him about this case, but we have made efforts. And I really don't know what happened to him.

      Q [by counsel for the State]. Was it more or less a scenario where he just disappeared?

> A. More or less. We sent e-mails and I've called, and I really don't know what happened with Mr. Greenway.
>
> . . . .
>
> And I did make attempts and I know that our office also made attempts to try to locate Mr. Greenway. And they were unsuccessful in speaking to him.

(ECF No. 42-7 at 281, 302). Attorney Quisenberry testified that upon being given

Cannon's case, he requested Mr. Greenway's file from the central office (*id.* at 281).

Attorney Quisenberry testified that he was not certain that the file he received from

the central office included everything that Mr. Greenway had in his file:

> Q. Do you believe that you have everything that Mr. Greenway had in his file in the file that you received [from the central office]?
>
> A. I'm not certain of that because the file that I had, the materials that I had together, I don't know, there were just a few notes in the file form Mr. Greenway. So I don't know—when the file was taken from him, it was sent to the Naples office. Then I received the materials back.
>
> So I believe I have all—I know I have all the discovery, the police reports. And he didn't take any depositions until I got on the case. So I believe I have the complete file, but I'm not certain because I haven't had a chance to speak to him.

(ECF No. 42-7 at 281–82). Attorney Quisenberry testified that the file he received

from the law firm's central office did not include any intake notes from Mr.

Greenway's initial interview with Cannon (*id.* at 239–40).

Attorney Quisenberry testified he personally met with Cannon six or seven times, and they spoke on the phone at least as many times (ECF No. 42-7 at 282). Quisenberry testified that Cannon's daughter, Kaitlyn Morris, was present during most of the in-person meetings (*id.* at 297). Attorney Quisenberry testified that Cannon did not want to go to trial, but she wanted him to thoroughly investigate the case (*id.* at 284). Attorney Quisenberry also testified that Cannon told him, on several occasions, that she had difficulty remembering the events of the night of the shooting (*id.* at 321–22). Quisenberry testified that Cannon's memory problems were problematic with respect to presenting a defense of self-defense and/or accident to a jury (*id.* at 322).

Attorney Quisenberry testified that the file he had with him at the evidentiary hearing was "constructed" and was not the official Musca Law Firm file (ECF No. 42-7 at 303). Quisenberry testified he asked the law firm's central office to send "every piece of information" and he reviewed everything that they sent (*id.* at 303–04). Quisenberry testified that his "constructed" file included "the police paperwork, . . . the discovery, and . . . deposition notices," but it did not include every document contained in the Musca Law Firm file (*id.*). Attorney Quisenberry testified that the background information on Michael Stubbs (admitted as Defendant's Exhibit 2), was collected by Cannon and a paralegal with the Musca Law Firm, Ms. Gonzalez

(*id.* at 305–06).  Quisenberry testified that Mr. Greenway sent that information to Quisenberry's office in Tampa (*id.* at 305–06).  Quisenberry testified he did not include that information in his "constructed" file for the evidentiary hearing, but it was at his office (*id.*).  Attorney Quisenberry testified he and Cannon reviewed some of the documents and discussed many of the topics that the documents covered, including Michael Stubbs' prior acts of violence (*id.* at 306, 310).  Quisenberry testified that although he reviewed the documents, he did not read each and every one (*id.* at 307).  He testified that Ms. Gonzalez, the firm's paralegal, had read each document, and he spoke with her extensively about them (*id.* at 307–08).  Attorney Quisenberry testified he was familiar with the fact that Michael Stubbs was terminated from the Quincy Police Department for lying during an internal affairs investigation and soliciting others to lie, but Quisenberry did not believe that information would be admissible at trial, because Stubbs was never convicted of perjury (*id.* at 309, 330).  Quisenberry further testified that "very little" of the background material on Michael Stubbs would have been admissible at trial (*id.* at 296–97).

With respect to crime scene photographs, Attorney Quisenberry testified that his file did not include the photographs (*see* ECF No. 42-7 at 325.  However,

Attorney Quisenberry testified that he was familiar with the photographs and had reviewed them with one of the prosecutors, Mr. Komisar or Mr. Powell (*id.* at 326).

With respect to a typewritten statement prepared by Cannon for Mr. Greenway (Defense Exhibit 3), Attorney Quisenberry testified that the statement was not in the file he received from the Musca Law Firm's central office, but Cannon had showed him most of it (ECF No. 42-7 at 322–26).  Quisenberry testified he remembered seeing it and discussing it with Cannon (*id.* at 323).

Attorney Quisenberry testified he and the prosecutor set the deposition of Michael Stubbs and the key law enforcement officer, Officer Donaldson (ECF No. 42-7 at 284).  Quisenberry testified that they never actually deposed Michael Stubbs because taking his deposition became a factor in plea negotiations.  Attorney Quisenberry explained:

> Mr. Powell was the prosecutor on the case at that time and we had met in his office in April [2011] to take the deposition of Mr. Stubbs.  I was in a room speaking to Mr. Stubbs and then I met with Mr. Powell and asked him was there a possibility if we did not take his deposition if he would go to his office to see if there could be a plea that did not involve a jail or prison sentence.  And he said he would consider that because Mr. Stubbs had told me on that date that he did not necessarily seek any kind of jail time or prison time for Ms. Cannon and that he would be in agreement with a house arrest or probation sentence, which I believe was something she would be happy to take, under the circumstances.
> . . . .
> [W]e knew that there was a lot of material on Mr. Stubbs that was negative.  And Mr. Powell was aware of that as well.  And because he didn't know how the deposition would go, neither did I.  And,

fortuitously, I had the conversation with Mr. Stubbs, just sitting in the room waiting for him [Mr. Powell]. And I just asked him and he just said that, under the circumstances, if there was some kind of house arrest or probation, I'd [Stubbs] be okay with that.

(ECF No. 42-7 at 284–85). Attorney Quisenberry testified that Cannon faced a twenty-year mandatory minimum prison sentence for the aggravated assault with a firearm charge, pursuant to Florida Statutes §§ 775.087 and 784.021(1)(a), which was charged as Count I in the Amended Information filed on August 17, 2010 (*see* ECF No. 42-7 at 285; *see also* ECF No. 42-1 at 66 (Amended Information)).[6] Attorney Quisenberry testified Mr. Powell agreed to speak with his supervisor about offering Cannon a non-prison sentence (ECF No. 42-7 at 286).[7]

Attorney Quisenberry testified that Mr. Powell subsequently notified him that he could not offer a non-prison sentence, but he could offer a three-year prison sentence (ECF No. 42-7 at 286). Quisenberry testified that Powell did not specify

---

[6] The Amended Information charged that Cannon assaulted Stubbs with a firearm and during the commission of the assault she actually possessed and discharged a firearm (ECF No. 42-1 at 66). At the time of Cannon's offense conduct, plea, and sentencing, Florida Statute § 775.087 imposed a twenty-year mandatory minimum prison term for a person convicted of aggravated assault who discharged a firearm during the course of commission of the aggravated assault. *See* Fla. Stat. § 775.087(2)(a)2. Aggravated assault was removed as a qualifying felony in 2016.

[7] Cannon accuses Attorney Quisenberry of canceling/postponing Mr. Stubbs' deposition "to pursue a plea offer that he acknowledged Petitioner Cannon was not interested in," but this mischaracterizes Quisenberry's testimony. Quisenberry testified that Cannon was not interested in a plea that *required prison time*. Quisenberry initially attempted to secure a non-prison plea agreement, but when that effort failed, he then pursued a plea of no mandatory or agreed-upon prison sentence and a "cap" or limit on the amount of prison time that the State would request at sentencing while the defense argued for a downward departure sentence of no prison time.

whether the three-year sentence would be a mandatory minimum term (*id.*). Quisenberry testified he communicated this offer to Cannon, but she rejected any offer that involved a guaranteed prison sentence, as opposed to leaving open the opportunity for the defense to argue for a downward departure (*id.* at 286, 297).

Attorney Quisenberry testified that Mr. Powell was replaced by Mr. Komisar (ECF No. 42-7 at 287). Quisenberry testified he deposed two of the other law enforcement officers in the case, and he deposed Cannon's daughter, who had seen some of the violence that Mr. Stubbs perpetrated on Cannon (*id.*).[8] Quisenberry testified that at that point in the case, they didn't know whether the plea offer would "get better than three years" (*id.* at 288). He testified he hoped to convince Mr. Komisar to agree to a "cap" or maximum sentence so he (Quisenberry) could argue for a downward departure sentence involving no prison time, based on the fact that

---

[8] Cannon asserts Attorney Quisenberry falsely testified that he deposed two other officers (*see* ECF No. 1 at 16). Cannon states:

> Concerning depositions, Mr. Quisenberry falsely claimed that he "took depositions of two of the other officers in the case." (H-224). Based on the postconviction investigation in this case, it does not appear that Mr. Quisenberry conducted the depositions as requested. The scheduled depositions were before a decision to plea was made (i.e., the depositions were cancelled in April and July, and the plea hearing was in September).

(*id.*). Cannon has not pointed to any *evidence* in the state court record to support this assertion. To the extent she is relying on information in the Docket Report (*see* ECF No. 42-6 at 92–103), that document reflects only the filing of notices of taking depositions and amended notices (*id.* at 95–96). This is far from clear and convincing evidence that Attorney Quisenberry testified falsely when he stated he deposed two other officers and Cannon's daughter.

Cannon had no prior criminal record, she had a lot of family and community support, she was a victim of Mr. Stubbs' violence, and she had expressed remorse to the occupant of the neighboring apartment, who was sleeping with her two young children when one of the bullets entered her bedroom at 3:00 a.m. (*id.* at 288–90, 292).   Attorney Quisenberry testified he had experience with sentencings and downward departures, and he believed that Cannon's case "had a lot of those factors going for her" (*id.* at 289).

Attorney Quisenberry testified that Officer Donaldson was scheduled for military active duty in August of 2011, so he and the prosecutor took Donaldson's deposition, which he characterized as "both our deposition and the perpetuated testimony [deposition]" (ECF No. 42-7 at 290).   Quisenberry testified that Officer Donaldson was a credible witness, and his deposition testimony "bolstered the State's case" (*id.*).

Attorney Quisenberry testified that he planned to go to trial until September of 2011, when Mr. Kosimar contacted him with a new plea offer:

> He said if we did not take Mr. Stubbs' deposition, because that was still something we had—if it's a trial, we had to take his deposition.  We had to.  And we were going to.  He said that if we waived that, if she entered a plea, he would waive the minimum mandatory.  It would be, in effect, an open plea.
>
> And he told me that he would recommend a sentence of three years in prison followed by probation, but we would be able to argue

for departure down to supervision.  And, in this case, we were going to argue for a combination of house arrest and probation.

(ECF No. 42-7 at 290–92).  Quisenberry testified that Mr. Kosimar would not offer

a "cap" or maximum sentence, but he promised he would argue for only three years

(*id.* at 296).

Attorney Quisenberry acknowledged that self-defense was an available

defense to a charge of aggravated assault with a firearm, but Quisenberry testified

that at the time Mr. Kosimar made the plea offer, he (Quisenberry) did not believe

that it was a viable defense in Cannon's case, based on what Cannon told him and

what she told Officer Donaldson on the night of the shooting (ECF No. 42-7 at 298,

313–17).[9]   Attorney Quisenberry testified that at the time of the plea offer, he

believed that the most viable defense was an accident defense (*id.* at 293–94).

Quisenberry testified he and Cannon discussed the defense theory they would pursue

if the case went to trial:

> She referred to the term "self-defense," but what she was describing to me was accident because, the way she described the scenario with Mr.

---

[9] Cannon contends Attorney Quisenberry's testimony describing Officer Donaldson's deposition testimony "indicates that he did not actually know what was said by Officer Donaldson during the deposition . . . ." (ECF No. 1 at 15).  Attorney Quisenberry described Donaldson's deposition testimony when he was explaining why he did not believe that self-defense was a viable defense (*see* ECF No. 42-7 at 294–95, 315–16, 330).  The fact that Quisenberry's description was inaccurate as to some matters does not mean that Quisenberry did not know the content of Donaldson's deposition testimony at the time he was representing Cannon and advised her regarding the plea.

Stubbs and the gun firing on both occasions, she did not purposely pull
the trigger.  He had his hands on the gun, the gun went off on both
occasions.  So accident is the apt description of that defense.

Self-defense would involve an intentional attempt to shoot, fire
the gun, and that's not what happened.  That's not the way she described
it.

(ECF No. 42-7 at 293–94).  Quisenberry testified that if they went to trial, they

would have presented the defense that Cannon did not intend to pull the trigger; that

Stubbs was wrestling with her, and the gun discharged twice; and that the jury could

not find her guilty because there was no criminal intent (*id.* at 294).

With respect to defense experts, Attorney Quisenberry testified that if they

had "gone forward to the trial mode," he would have investigated to determine if

there were any experts that would support a defense, including a forensic

reconstruction expert (ECF No. 42-7 at 298, 318–19).  But Quisenberry

acknowledged that there were problems with a reconstruction expert because there

were no measurements from the crime scene (*id.* at 298).[10]  Quisenberry testified:

Had she decided we were going to go to trial at the point we were given
the offer from Mr. Komisar, we may have taken that path.  I don't know.
. . . .
I can't speculate, given the number of possibilities there.  I can
tell you this. . . . Given the 20 year minimum mandatory and give[n]
that there was a very competent prosecutor, that she had made a
statement that I believe would have been very difficult to overcome, an

---

[10] Cannon offered no evidence that the crime scene would have been available for measurements
by the time Attorney Quisenberry took the case, which was months after the incident.

opinion by any expert I believe would still expose her to tremendous risk under the circumstances, particularly under this evidence.

. . . .

Given the risks and magnitude of what Ms. Cannon was facing, I still can't tell you that I wouldn't have still recommended a plea under the circumstances.

(ECF No. 42-7 at 319–20).

Attorney Quisenberry testified he discussed Mr. Komisar's plea offer with Cannon on several occasions (ECF No. 42-7 at 291). He testified he told her:

[Y]ou might win this trial, but I think, more often than not, you won't. And if you don't, the judge has no discretion, it's going to be 20 years.

And I told her that my job is to try to prevent pain. I try to bring the client, as close as I can, back to where their life was before all this happened. And that's why I was so adamant about trying to get a different type of offer from Mr. Komisar, so I could at least argue for departure. And I thought she had real serious and positive and substantial grounds for departure. She had no record at all. No one was actually hurt. And that's what I conveyed to her. And she agreed.

(ECF No. 42-7 at 293). Attorney Quisenberry testified he read the plea form to Canon and had her go through it (*id.* at 327). Quisenberry testified he told Cannon that it was her choice to accept the plea offer or go to trial (*id.*). He testified that Cannon "had concerns," but he told her that the chance of conviction was high and, if she was convicted, the judge was required to impose a mandatory twenty-year prison term (*id.* at 327–28). Quisenberry testified:

Most—many defendants, many clients have reservations and will not acknowledge their guilt, but they still enter pleas. And she did.

Q.  So it caused you no concern?

A  It always causes me concern.  But, ultimately, at the end of the day, it's her decision.  My job is to try to give her the best advice I can.  And I believe that if we had gone to trial, we would have likely been convicted—she would have been convicted.  And that's why my advice was for her to enter the plea.

She had concerns, but I did not tell her what to do.

(ECF No. 42-7 at 328).

The state court record includes materials submitted to the circuit court after the evidentiary hearing.  Included in those materials is a handwritten letter dated December 19, 2011 (four days after Cannon's sentencing), from Cannon to "All of Musca Law" and Mr. Sol Alan Skalla, Cannon's "power of attorney" (ECF No. 42-6 at 330).  Also included is a handwritten letter dated January 19, 2012, from Cannon to the Ufferman Law Firm (Cannon's counsel in the Rule 3.850 proceedings and this federal proceeding) (*id.* at 329).  Notably, in both letters Cannon claims to have memory problems/lapses (*id.* at 329–30).

The state circuit court adjudicated Cannon's claims as follows:

The Defendant was charged June 18, 2010, with Aggravated Assault With a Firearm.  The Information was amended two times to include charges of Shooting Into or Within a Building.  The charges arose from an incident alleged to have occurred on May 29, 2010. Tracy Record, an Assistant Public Defendant [sic] was appointed to represent the Defendant.  Shortly thereafter, attorney Joshua Zelman substituted as attorney of record for the Defendant.  Shortly thereafter,

attorney Ryan Davis substituted in for the Defendant. Thereafter, attorney Lee Greenway filed his appearance as counsel for the Defendant. All of these substitutions occurred in 2010. In March of 2011, attorney Jeff Quisenberry filed his appearance as the Defendant's attorney.

On October 13, 2011, the Defendant entered into an open plea before the Court. On December 15, 2011, the Defendant was sentenced based upon her plea by Judge Jackie L. Fulford. Her attorney asked for a downward departure and no prison time. The State asked for three years in prison and probation. She received five years in prison, followed by two years community control, followed by eight years [of] probation, followed by fifteen years [of] probation. She received a concurrent five year prison sentence on one count.

. . . .

3. The Defendant alleges that her trial counsel, Jeff Quisenberry's performance at trial was deficient, that he made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment, and that the errors prejudiced the defense by depriving the Defendant of the opportunity for a fair trial. Due to his failures, the Defendant elected to accept a plea and waived her right to trial. The specific allegations were that Mr. Quisenberry:

A. Failed to properly investigate the case and failed to advise the Defendant she had valid defenses to the charges.

B. Failed to retain experts to review the case.

. . . .

4. In reviewing testimony of witnesses at the hearings herein, the Court finds as follows:

A. Christopher Stewart was called on behalf of the Defendant. He is an engineer and accident reconstruction specialist. He was asked to determine the trajectory of the bullets fired, in order to establish exactly where the Defendant was standing when the weapon was discharged. He said based upon his evaluation, she was 4 to 5 feet to the right of the bedroom door, which would be consistent with the Defendant's statement that she did not fire until Mr. Stubbs was moving

towards her.  This would lend support to the Defendant's position that she was only defending herself from the advances of Mr. Stubbs, as he had abused her significantly in the past and she was afraid of him.  This was completely inconsistent with the statement Michael Stubbs provided to Tallahassee Police.  It was also inconsistent with statements made by the Defendant to Police the night of the incident, and statements thereafter.

Mr. Stewart stated that he arrived at his conclusions based upon the statement of Michael Stubbs, the statement of the Defendant given to Tallahassee Police Officer Paul Donaldson, and a statement prepared by the Defendant for her sentencing hearing.  Mr. Stubbs [sic] testified that his conclusions were limited by the lack of documentary evidence from the scene, in that there was no documentation taken by the Police as to room sizes, no photographs taken with any type of measurement instrument, and he had never personally visited the scene of the crime.  He also indicated that had he actually been recreating the scene, he would have gone into the crime scene and taken a lot of measurements in support of his position.  He stated that to be accurate he would need a significant amount of additional information than he had.

Mr. Stewart's opinion contradicts that [sic] statements of the Defendant and Michael Stubbs.  It is also only based upon a reasonable degree of engineering probability.  The Court does not give a lot of weight to the testimony of Mr. Stewart, and does not feel that the Defendant has shown with a reasonable degree of probability that had she been aware of his testimony, she would not have accepted the plea and gone to trial.  Testimony of counsel was that the Defendant never wanted to go to trial at any time, and the testimony of Mr. Stewart does not convince the Court that she would have changed her position.  Further, there was no showing that the Defendant was unaware of the defense of accident prior to her plea.  In fact, she made statements to the effect that the gun discharges [sic] accidentally.  This was one of several versions of the events that happened the night in question, that she opined.

B.  The Defendant presented testimony of Dr. Jill Ricke.  She is a licensed psychologist with a specialty of treating individuals with

Post-Traumatic-Stress-Disorder (PSTD) [sic].    She stated that the Defendant was suffering from PTSD.    She stated that it was common for victims of domestic abuse to lie to the authorities, due to the fear of further abuse.    This, in her opinion, explained the statement of the Defendant given to Officer Donaldson the night of the incident.    She stated that Mr. Stubbs was still in the Defendant's presence when her statement was given.    The Defendant was not confident the Police could protect her, as Stubbs was in law enforcement, and the Defendant had made complaints before about abuse and nothing was done.    Dr. Ricke stated that the Defendant had been abused by Stubbs, who has abused others. He had threatened to kill the Defendant, and she was using the gun the night of the incident to protect herself.

Dr. Ricke had never testified before a jury about self defense, but had testified about a person suffering PTSD.    She stated that she felt the Defendant was so trustworthy, no additional testing was necessary to determine if she suffered PTSD.    The testimony of Dr. Ricke that the Defendant was only using the gun to protect herself, contradicts the statements of the Defendant that the gun discharged accidentally, and several other of the numerous variations given by the Defendant to explain what happened.    In addition, Dr. Ricke had no plausible explanation as to why the statements of the Defendant and Mr. Stubbs matched one another, when they were interviewed separately.    Dr. Ricke never talked to Mr. Stubbs.  She did not speak with Tracy Record, Ryan Davis, Lee Greenway or Jeff Quisenberry.    She had formed such a close relationship with the Defendant that she referred to her as Dana, rather than Mrs. Cannon.    She started a statement with "a lot of women" and then corrected herself.    When asked by the Court if she had ever testified about PTSD for a male, she stated no.    It was clear to the court that Dr. Ricke would always accept the woman's side of a statement, rather than view the situation with neutrality as an expert is expected to do.    This caused the Court concern as to the objectivity of the witness, and her credibility.    Her findings were not supported by the other evidence in the case, nor were they supported by the testimony of the Defendant.    The Court assigned little, if any, credibility to the findings of Dr. Ricke.    Further, as argued by the State, there is a serious question as to whether Dr. Ricke would even have been able to testify at trial. Character evidence is inadmissible unless specifically placed in interest

by the State.  The Court does not find that her testimony would have changed the Defendant's decision to plea, rather than take the case to trial.

C.  Kaitlyn Mullins was called as a witness.  She is the daughter of the Defendant.  As such, it was clear to the Court that she was testifying to whatever was necessary to help her mother.  She testified that she was present for every conference her mother had with Jeff Quisenberry and listened to every telephone conference between them. She readily admitted she had a personal bias against Michael Stubbs.  It was noteworthy that Ms. Mullins attested to no involvement in her mother's case through her four prior attorneys.  It was only with Jeff Quisenberry, the attorney being blamed for ineffective assistance herein, that she became involved.  Her testimony at hearing was given no weight.

D.  Dana Cannon, the Defendant, also became a witness.  It was revealed that she had given at least 8 conflicting versions as to what happened the night of the incident.  Her memory of the incident, although unclear prior to her sentence, has now become crystal clear as to what happened.  Her stated strong desire not to go to trial, has now manifested itself in a strong desire to go to trial after her sentence. According to Jeff Quisenberry, she told him at least 20 times that she never fired a weapon.  This is not supported by the other evidence.  She stated another time that she never intentionally fired the gun, it just went off when he jumped her.  This certainly would not support self defense as now is asserted by Defendant.  We have numerous conflicts regarding the gun.  She didn't fire it.  It went off by accident.  She was using it for self defense.  She fired it intentionally.  We have every possible position, except that she never had a gun, which would have been totally unbelievable.  The first shot was caused by his hands wrapped around hers.  The second was because he actually pulled the trigger while they were fighting on the bed.  Her testimony as to what happened that night would have carried no credibility at a trial due to the multiple versions she provided.

When asked if she would lie about something, the Defendant stated, "not in Court".  However, she admitted to lying under oath in

different venues—once in an internal affairs investigation, and once in Court when obtaining a domestic violence injunction. In the later case, she only lied because the Gadsden County Sheriff's Department told her to do so. It seemed she had a self serving reason for everything.

At hearing herein, she contradicted her statement in her motion. She stated that Ryan Davis, a former attorney, had talked with her about self defense and battered woman syndrome—the exact defenses she said she never discussed prior to her plea. She further testified that from November 2010, through October 2011, the only thing she ever talked to Jeff Quisenberry about was a plea. The Court finds that testimony, as compared to all the other evidence in the case, to be unbelievable. Mrs. Cannon even tried to say that Judge Fulford accepted her plea with her being distraught, crying, that she did not read the form, and was totally unaware of what was going on. This Court has personally observed Judge Fulford in her plea colloquy, and that would never happen. When pressed, the Defendant said she was not lying when she answered the questions of Judge Fulford and that she knew what was going on. She also stated that she had no [sic] seen any evidence or reports before the plea and consequently did not know what was going on. This belies her statements that she discussed the case with Ryan Davis and Joshua Zelman and was aware of certain defenses.

Mrs. Cannon is experiencing buyer's remorse. The facts presented in support of this motion, only establish that she was not coerced into a plea. After receiving an unacceptable sentence, one can only surmise that had she received her downward departure and probation, her attorney's performance would have been excellent and most appreciated. Her dissatisfaction with counsel and manifestation of his failure to properly represent her raised after receipt of a legal, albeit long sentence, is not a basis for a 3.850 claim. The Court notes that Judge Fulford at sentencing, found that Mr. Quisenberry had proven a basis for a downward departure by clear and convincing evidence. It is not ineffective assistance on his part that the Court declined to use her discretion to mitigate. The Court finds that the testimony of the Defendant is not credible.

E.  Jeff Quisenberry also testified at hearing.  He stated that the Defendant did not want a trial if at all possible.  He stated that he discussed the issues with the Defendant, including going to trial and presenting the defense of accident.  He indicated that he discussed with her the difficulty and limitations of a PTSD defense.  It was always the decision of the Defendant as to whether she went to trial or accepted a plea.  He investigated the case, took depositions, investigated the prior violent acts of Michael Stubbs, obtained files from the previous 4 attorneys, reviewed same, reviewed discovery, and explored a plea with downward departure.  He testified that the Defendant was fully informed and decided to accept the plea on her own.  She was aware of what was going on and aware of the ramifications of entering an open plea.  The Court finds his testimony to be credible.

F.  The State presented Adam Komisar, a former Assistant State Attorney handling the case.  He stated that it was clear to the Defendant and Mr. Quisenberry that the Defendant was facing a 20 year minimum mandatory prison sentence if convicted at trial.  This certainly entered into the thought process of the Defendant in deciding to accept a plea.  Mr. Quisenberry was successful in getting Mr. Komisar to continue his agreement to not seek the 20 year minimum mandatory, and only seek a 3 year minimum mandatory.  Even though there was no specific agreement regarding a prison sentence, the Defendant's exposure was substantially reduced by the efforts of Mr. Quisenberry in obtaining the plea agreement and she stood a realistic possibility of receiving a downward departure.
. . . .
Upon consideration of the testimony of Mr. Quisenberry, the Court finds that his testimony is more credible than that of the Defendant.  From the record and testimony of all the witnesses, the Court finds that there was no basis for this motion and this claim should be denied.

(ECF No. 42-3 at 59–70).  The court cited *Strickland* as the applicable legal standard

and concluded that Cannon failed to satisfy that standard:

> To prove the decisions made by Mr. Quisenberry to be incorrect and ineffective, the Defendant has the burden of showing that no competent counsel would have made the same decision[.]  White v. State, 729 So.2d 909 (Fla. 1999).  After the Court's review of the entire file, it is clear that there was more than enough evidence to convict the Defendant, and she would have been looking at a 20 year minimum mandatory sentence.  It is obvious that the Defendant made a wise decision in entering an open plea.  Even though she is not satisfied with the sentence she received, it is substantially less that she would have received if convicted at trial.

(ECF No. 42-3 at 71).    The First DCA issued a one-word decision, "Affirmed." *Cannon*, 166 So. 3d at 768.  Cannon's subsequent efforts to set aside the circuit court's decision were ultimately unsuccessful.

Where the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*

Looking through the First DCA's unreasoned decision to the circuit court's reasoned order, Cannon has not demonstrated that the state court's decision was contrary to clearly established federal law.  The state court utilized the *Strickland* standard, and the facts of Cannon's case are not materially indistinguishable from a

Supreme Court case where the court held that the petitioner satisfied that standard. Therefore, Cannon has not satisfied the "contrary to" clause of § 2254(d)(2).

Cannon also has not demonstrated that the state court's decision was based upon an unreasonable factual determination. The state court's decision was based upon its determination that Attorney Quisenberry's testimony was credible. Questions of the credibility and demeanor of a witness are questions of fact. *See Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). "The deference compelled by the AEDPA requires that a federal habeas court more than simply disagree with the state court before rejecting its factual determinations." *Nejad v. Attorney*, 830 F.3d 1280, 1292 (11th Cir. 2016) (internal quotation marks and citation omitted). "Reasonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). "In the absence of *clear and convincing evidence*, [courts] have no power on federal habeas review to revisit the state court's credibility determinations." *Nejad*, 830 F.3d at 1292 (emphasis in original) (citation omitted).

With respect to the reasonableness standard applicable to the state court's factual findings, the Eleventh Circuit has explained:

> The Supreme Court has conceded that "the term 'unreasonable' is no doubt difficult to define," *Wood*, 558 U.S. at 301 (quoting *Williams v.*

*Taylor,* 529 U.S. 362, 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (internal quotation marks omitted)), but the Court has instructed that it is not sufficient that "the federal habeas court would have reached a different conclusion in the first instance," *id.* That is, the state court's determination must be "objectively unreasonable." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003). The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was "too powerful to conclude anything but [the petitioner's factual claim]," *Miller–El v. Dretke* (*Miller-El II* ), 545 U.S. 231, 265, 125 S. Ct. 2317, 162  L. Ed. 2d 196 (2005), and when a state court's finding was "clearly erroneous," *Wiggins v. Smith*, 539 U.S. 510, 528–29, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

The Supreme Court has been clearer about explicating the standard for § 2254(d)(1) ("contrary to, or . . . an unreasonable application of . . . Federal law"). In that context, the Court has said that habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (internal quotation marks omitted). We apply this same standard when evaluating the reasonableness of a state court's decision under § 2254(d)(2). *See Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) ("A state court's . . . determination of facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination. . . ."); *accord Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1332 (11th Cir.), *cert. denied sub nom. Ferguson v. Crews*, — U.S. —, 134 S. Ct. 33, — L. Ed. 2d — (2013).

*Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1294 (11th Cir. 2015)

(quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (footnote omitted).

Here, a fairminded jurist could agree with the state court's determination that

Attorney Quisenberry's evidentiary hearing testimony was credible, and that

Cannon's was not. Cannon has not carried her AEDPA-imposed burden of

establishing, by clear and convincing evidence, that the state court's adjudication of her IAC claim was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Therefore, Cannon has not satisfied § 2254(d)(2).

Cannon's final opportunity to demonstrate her entitlement to federal habeas relief is to establish that the state court's application of the *Strickland* standard was objectively unreasonable, under § 2254(d)(1). Cannon fails to make that showing. Attorney Quisenberry described Cannon's position during their discussions as not wanting to go to trial, but still wanting a thorough investigation of her case. The only witnesses to the events which led to the discharge of the firearm were Canon and Michael Stubbs.[11]   Attorney Quisenberry read the police report and witness statements, reviewed the crime scene photos, discussed the incident with Cannon, reviewed the written materials she provided (including the background materials on Stubbs, and Cannon's written description of the history of their relationship and the events on the night of the shooting), deposed the three police officers involved, and fully intended to depose Stubbs (until that became a factor in the plea negotiations). Attorney Quisenberry was reasonably concerned with Cannon's stated memory

---

[11] Ms. Kiwanis White resided in the apartment next to Cannon and Stubbs' apartment. She witnessed the entry of one of the bullets into her apartment (*see* ECF No. 42-3 at 75–78 (police report)).

problems and credibility issues, which would certainly have been brought out by the prosecutor at trial. Cannon was adamant that she did not want any prison time. The State was willing to plea bargain but would not agree to a sentence that did not involve prison time. Attorney Quisenberry convinced the State to waive any *mandatory* prison term and to allow Cannon to attempt to avoid prison by obtaining a presentence investigation and arguing for a downward departure sentence of no prison time. Attorney Quisenberry ascertained that Michael Stubbs would not oppose a non-prison sentence. Quisenberry strategized that it was less risky to take that plea deal and use the PTSD/self-defense argument to seek a downward departure for no prison time, than to assert PTSD/self-defense as an affirmative defense at trial where, if it failed, Cannon faced a mandatory twenty years in prison and a possible total sentence of thirty-five years (*see* ECF No. 42-6 at 161–63 (sentencing scoresheet)). Attorney Quisenberry discussed the plea offer with Cannon on several occasions, gave her his opinion, read the plea form to her, and had her go through it herself. By signing the plea agreement, Cannon "stated and swore" that she read the plea form and understood "each paragraph and all the terms" (*see* ECF No. 42-6 at 159–60). One of those paragraphs was the following:

> My lawyer has told me the facts the State would have to prove before I could be found guilty. I discussed with my lawyer any possible defenses. There are no alibi or defense witnesses my lawyer has refused to investigate. I am fully satisfied with my lawyer's services.

(ECF No. 42-6 at 159).  Attorney Quisenberry told Cannon that it was her choice to accept the plea offer or go to trial.  Cannon had concerns (as would most defendants when weighing risks that affect their liberty), but Cannon decided to take the offer. As Attorney Quisenberry testified, if Cannon had not accepted the plea offer, he would have developed the defense case for trial, pursing the theory that he and Cannon had discussed and possibly others, and possibly consulting experts.

The state court reasonably concluded that at the time Attorney Quisenberry discussed the plea offer with Cannon, Quisenberry had conducted a reasonable investigation of the facts, reasonably assessed the viability of Cannon's defenses based upon the information he had at that time, and reasonably advised her regarding the risks, benefits, and consequences of accepting or rejecting the plea offer.  The state court also reasonably concluded that Cannon knowingly, intelligently, and voluntarily chose to accept the State's plea offer.

Cannon failed to show that the state court's adjudication of Ground One was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of clearly established federal law.  Therefore, Cannon is not entitled to federal habeas relief on Ground One.

**B.     Ground Two:  "Defense counsel rendered ineffective assistance of counsel by failing to present the following mitigating circumstances during the sentencing hearing:  'The defendant requires specialized**

**treatment for a mental disorder that is unrelated to substance abuse or addiction . . . and the defendant is amenable to treatment.'"**

Cannon alleges Attorney Quisenberry rendered ineffective assistance by failing to present the following mitigating circumstance during the sentencing hearing: "The defendant requires specialized treatment for a mental disorder that is unrelated to substance abuse or addiction . . . and the defendant is amenable to treatment." (ECF No. 1 at 31–33) (quoting Florida Statutes § 921.0026(2)(d)). Cannon alleges her PSI stated she was receiving Social Security Disability for bipolar disorder, depression, borderline personality disorder, anxiety disorder/panic attacks, headaches, hypertension and fibromyalgia (ECF No. 1 at 31). Cannon argues that no reasonable attorney would have failed to present this mitigating factor at her sentencing (*id.* at 31–32). Cannon argues that if Attorney Quisenberry had presented this mitigating factor, there is a reasonable probability that her sentence would have been different (*id.* at 32–33). Cannon contends the state court's rulings on this IAC claim were contrary to and an unreasonable application of *Strickland*, and based on an unreasonable determination of the facts in light of the evidence contained in the state court record (*id.* at 46–47).

The State concedes that Cannon exhausted this claim in the state courts (*see* ECF No. 10). The State contends the state court's adjudication of Cannon's claim

was not based upon an unreasonable determination of the facts, nor was it contrary

to or an unreasonable application of clearly established federal law (*id.* at 37–41).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this claim.

### 2.    Federal Review of State Court Decision

Cannon presented Ground Two in her "Supplemental Postconviction Claim"

(ECF No. 42-2 at 228–46).  She argued that Attorney Quisenberry was ineffective

for failing to argue that her need for treatment for mental health disorders was a

mitigating circumstance that reasonably justified a downward departure sentence,

pursuant to Florida Statutes § 921.0026(2)(d).

Cannon's sentencing scoresheet, PSI, and transcript of her sentencing hearing

are part of the record of the state post-conviction proceedings (ECF No. 42-6 at 161–

63 (sentencing scoresheet); ECF No. 42-6 at 185–280 (transcript of sentencing);

ECF No. 42-4 at 6–16 (PSI)).  Cannon's sentencing scoresheet reflected a lowest

permissible prison sentence of thirty-three months and a statutory maximum of

thirty-five years (ECF No. 42-6 at 161–63).

According to Cannon's PSI, Cannon was granted Social Security Disability

benefits in January of 2011 (after the offense conduct in May of 2010 and before her

plea and sentencing in October and December of 2011, respectively) due to bipolar

disorder, depression, borderline personality disorder, anxiety disorder/panic attacks, headaches, hypertension, and fibromyalgia (ECF No. 42-4 at 13).  Cannon told the probation officer, Jennifer Thurber, that she was "stable on her medications" (*id.* at 15).  Ms. Thurber recommended that the court impose the guidelines sentence, but if the court chose to depart, she recommended community control with GPS monitoring, no contact with the victim(s), payment of restitution to Ms. White, and compliance with "all mental health conditions" (*id.* at 15–16).

At the sentencing hearing, Attorney Quisenberry elicited the following testimony from Cannon.  Cannon was disabled and recently diagnosed with PTSD (ECF No. 42-3 at 215).  She had been in an "off and on" intimate relationship with Michael Stubbs for two years (*id.* at 217).  During their relationship, Stubbs was emotionally abusive and committed acts of domestic violence against her (*id.* at 217–19, 231–34).  Michael Stubbs lost his certification as a police officer due to domestic violence (*id.* at 220).  Cannon took Cymbalta and two medications for restless leg syndrome, and she recently started taking Tegretol (*id.* at 222).  Cannon acknowledged that she was advised not to mix her medications with alcohol, but she drank two alcoholic drinks on the night of the shooting (*id.*).  Cannon never intended to hurt Mr. Stubbs on the night of the shooting (*id.* at 223).  Stubbs placed his hands on her in a violent way that night, and Cannon suffered bruises as a result of his

trying to grab her (*id.* at 222–25, 231). Cannon admitted she was holding the gun and it discharged, but she said she never intended to shoot anyone (*id.* at 226). Cannon was extremely remorseful about the fact that a bullet went into the wall of the neighboring apartment, where children were nearby (*id.* at 225–26). Cannon spoke with the children's mother and tearfully apologized (*id.* at 226–27). Cannon was haunted everyday with the idea that a child could have been injured (*id.* at 227). Cannon acknowledged that the event would not have transpired if she had not had the gun that night (*id.* at 226). She stated that if she could do it all over again, she never would have "pulled" the gun (*id.* at 227). Cannon talked about the incident in therapy (*id.*). Cannon planned to attend counseling for victims of domestic abuse and violence (*id.* at 229).

Attorney Quisenberry presented testimony from six other witness. Tia Legree testified she supervised Cannon during her pretrial release (ECF No. 42-6 at 192). Ms. Legree testified that Cannon complied with all of the conditions of her release, including the requirement that she remain alcohol free (*id.* at 193–95).

Two law enforcement officers, Jim Corder and Kevin Godwin, testified that they knew Cannon personally and knew of her charitable work with animals (ECF No. 42-6 at 197–201). They testified that if Cannon was sentenced to a term of supervision, they would be available to assist her in completing the conditions of her

supervision (*id.*).  Patty McCord, a friend of Cannon's, testified she also would be available to assist Cannon in completing the conditions of her supervision (*id.* at 211–13).

Cannon's daughter, Kaitlyn Mullins, testified she witnessed acts of violence perpetrated by Michael Stubbs on her mother (ECF No. 42-6 at 203–04).  Ms. Mullins testified that Stubbs had more than 25 firearms in the apartment, and he kept a firearm in the waistband of his shorts at all times (*id.* at 204–05).  Ms. Mullins testified that Cannon repeatedly expressed remorse about what could have happened on the night of the shooting (*id.* at 238).  Ms. Mullins testified that Cannon was in therapy (*id.*).  She testified she would assist her mother in completing the terms of her supervision (*id.* at 205–06).

Sol Alan Skalla testified he had known Cannon for thirty years (ECF No. 42-6 at 207–08).  Mr. Skalla testified that Cannon was involved in charitable projects (*id.* at 208).  He testified that Cannon was very remorseful about the fact that she could have hurt someone (*id.* at 236–37).  Mr. Skalla testified he would assist Cannon in completing the terms of her supervision (*id.* at 209).

The State presented testimony from Kiwanis White, who lived in the neighboring apartment on the night of the shooting (ECF No. 42-6 at 239–40).  Ms. White testified that her three-year old and six-year old children were in bed with her

when the bullet entered her bedroom at 3:00 a.m. (*id.* at 240). Ms. White testified she was a full-time student at the time of the shooting and normally would have been sitting on the edge of her bed studying, in the path of the bullet, but that night "by the grace of God, I wasn't up" (*id.*).

The State also presented testimony from Michael Stubbs (ECF No. 42-6 at 243–). Stubbs testified that Cannon told him she was drunk on the night of the shooting (*id.* at 254–55). Stubbs described what happened on the night of the shooting (*id.* at 247–48). He testified that Cannon harassed him while she was on pretrial release, including driving by his house, even though she was not supposed to have contact with him (*id.* at 243–45). Stubbs testified that Cannon also repeatedly falsely reported him to law enforcement for stalking her (*id.*). Stubbs testified he initially had no problem with Cannon being sentenced to probation or house arrest, but he changed his mind, and believed that thirty-five years in prison was an appropriate sentence (*id.* at 245, 254, 257–58).

The prosecutor requested the guidelines sentence of thirty-three months in prison (ECF No. 42-6 at 269–73).

Attorney Quisenberry requested that the court mitigate Cannon's sentence and sentence her to a departure sentence of two years of house arrest (ECF No. 42-6 at 259–68, 273–74). As grounds for departure, Quisenberry argued two mitigating

factors: (1) Mr. Stubbs was the aggressor, provoker, or instigator of the incident, *see* § 921.0026(2)(f); and (2) the offense was an isolated incident for which Cannon had shown remorse, *see* § 921.0026(2)(j) (*see* ECF No. 42-6 at 259–68, 273–74). Attorney Quisenberry also argued that Cannon had no prior record and had strictly followed the conditions of her pre-trial release (*id.* at 260, 264–68).

The sentencing court stated that it reviewed the PSI (*see* ECF No. 42-6 at 275). The court announced that it would not impose a downward departure for these reasons:

> Based on all the testimony that occurred, I have to say I agree with some of the things that your attorney has said. What could have happened, I hate to think. We could be here under circumstances with a dead, very young child.
>
> And although you have testified and I accept the testimony of some of your witnesses that throughout this period of time while these charges have been pending you do show some type of remorse, you even struggled while on the stand today to take responsibility for what happened. And in response to your own attorney's questions, "guessed" you may be responsible for what happened. That concerns the court.
>
> Ms. Cannon, to be quite frank with you, I'm concerned about your potential mental health issue, medication being taken with alcohol, and the fact that you sat before the court today and put 90 percent of the blame on what took place with Mr. Stubbs.
>
> If you had problems with him in the past, although I understand that and I am not new to domestic violence and I understand the patterns that exist in domestic violence, I simply do not accept the explanation that what took place in the home that evening was not your fault. I

don't accept that.  I find that you are a risk to the community under
these circumstances.

(ECF No. 42-6 at 2776–77).

At the post-conviction evidentiary hearing, Cannon presented testimony from
Dr. Jerry Burghout.  Dr. Burghout testified he had been a clinical psychologist since
1976 (ECF No. 42-3 at 3).  Dr. Burghout testified he was not currently licensed by
the Florida Department of Health, but he was licensed with the Florida Department
of Children and Family Services for "dual diagnosis" treatment (mental health and
alcohol/drug addiction), forensic counseling, and substance abuse treatment (*id.* at
7–9).  Dr. Burghout testified that the last time he held a license as a psychologist in
the United States was 1978 (*id.* at 8).  He testified he did not do clinical work, he
only conducted assessments and evaluations (*id.* at 9).  Dr. Burghout testified that
from 1990 to 1996, he was the state director for Correctional Treatment Services
with the FDOC, during which time he supervised 186 practitioners and developed
and maintained treatment programs for FDOC institutions, some women's prisons,
and some work release programs (*id.* at 5–6, 8).

Dr. Burghout testified he conducted a "one-on-one" evaluation of Cannon in
March 2013, while she was incarcerated in the FDOC (*see* ECF No. 42-3 at 10).  He
testified he interviewed her twice at Gadsden Correctional Institution (*id.* at 11).  Dr.
Burghout testified that during the first interview, Cannon had just received her daily

medication for anxiety and depression, and "presented herself in such a fashion that there was initial concern as to whether or not the information was correct or whether or not she was able to truthfully and honestly respond to the evaluation process" (*id.*).  Dr. Burghout testified that Cannon had poor eye contact and was confused and unable to respond to questions (*id.* at 11–12).

Dr. Burghout testified he interviewed Cannon a second time a few days later, and scheduled it in the afternoon so it was not immediately after she received her medication (ECF No. 42-3 at 11).  Dr. Burghout testified that Cannon "presented more concurrently and more cohesively" (*id.*).  Dr. Burghout testified he diagnosed Cannon under Axis I with bipolar disorder, anxiety, and depression (*id.* at 13).  He testified he also listed PTSD as an Axis I disorder in his report, but he "probably should have listed that as a rule out" (*id.*).  Dr. Burghout's written report did not include anxiety or depression as Axis I mental health disorders, but the report did include alcohol dependence (in remission), panic disorder with agoraphobia, and eating disorder (*see* ECF No. 42-2 at 243–44).[12]  Dr. Burghout testified he diagnosed Cannon with borderline personality disorder as a behavioral or Axis II disorder, and fibromyalgia and restless leg syndrome as Axis III medical conditions (ECF No. 42-

---

[12] Dr. Burghout's report is part of the state court record (ECF No. 42-2 at 235–46).

3 at 12). Burghout testified that after the second interview, he reviewed Cannon's medical records, including her FDOC records (*id.* at 14).

Dr. Burghout testified regarding the generally accepted treatments for Cannon's disorders. He testified that most Axis I disorders, like bipolar disorder, anxiety, and depression, were controllable with medication and psychiatric services, which could be provided by a psychiatrist or "skilled medical doctor" (ECF No. 42-3 at 15, 20). Burghout testified that panic disorder was a behavioral disorder, which required psychological or mental health counseling instead of medication (*id.* at 15). Burghout testified that borderline personality disorder required twelve to eighteen months of outpatient treatment (*id.* at 16). Dr. Burghout testified that PTSD could be treated with group or individual counseling (*id.* at 15–16, 20).

Dr. Burghout testified generally regarding treatment in the prison setting. He testified that prisons generally provide treatment in the form of medication and group counseling but do not provide one-on-one outpatient treatment (ECF No. 42-3 at 17–19). He testified that the most appropriate treatment for Cannon was six months of in-patient treatment followed by eighteen months of one-on-one outpatient counseling (*id.* at 16–19, 21).

On cross-examination, Dr. Burghout changed his testimony regarding treatment for bipolar disorder. He testified that medication was *not* a proper

treatment and that the appropriate treatment for bipolar disorder was counseling

because it was a "behavioral" disorder (ECF No. 42-3 at 20).  The court questioned

Dr. Burghout about the change in his testimony:

> THE COURT:  All right.   Doctor, let me ask a couple of questions, just to clarify my notes, because it seemed like to—you made two different statements.
>
> In your direct examination I had that you said that the general treatment for bipolar depressive disorder was medication.  That it's controlled by medication.   That panic disorder takes long-term psychological treatment and counseling services as opposed to medication.  And PTSD requires long-term counseling, and it's—both of the counseling issues are more effectively done in an outpatient setting, rather than an inpatient setting.  And then when you testified, I believe on cross, it sounded like you said that bipolar was treated by counseling not medication.
>
> THE WITNESS:  I said that it was treated by counseling, but if there is—the bipolar has a depressive—it creates a depressive situation.  As an ancillary, it is treated by medication.  But bipolar is primarily treated by long-term outpatient, individual counseling.
>
> THE COURT:  Well, my experience as a lawyer as well as a Judge is that pretty much everybody that I have had in front of me that were diagnosed as being bipolar, or, years ago, manic depressive—
>
> THE WITNESS:  Yeah.
>
> THE COURT:  —were being treated by medication.
>
> THE WITNESS:  I see that—well, depression is by medication, yes.
>
> THE COURT:  Isn't bipolar and manic depressive the same thing?

THE WITNESS:  No.

THE COURT:  Rose by any other name smells as sweet.

THE WITNESS:  Thank you, Judge.  No—but it's a—by degree bipolar is a lesser degree than manic depression.

(ECF No. 42-3 at 22–23).

Dr. Burghout testified that his diagnoses of Cannon and recommendations for treatment were based upon his two, two-hour interviews with her (the first of which he admitted was unproductive) (ECF No. 42-3 at 21–22).  He testified he did not administer any testing or examinations (*id.*).

The state circuit court adjudicated Cannon's claim as follows:

> In a supplemental claim, Defendant argued that her attorney failed to present mitigation at sentencing regarding Defendant's mental issues and her willingness to seek professional treatment for same, thus establishing a reason for downward departure.
>
> 4.  In reviewing testimony of witnesses at the hearings herein, the Court finds as follows:
> . . . .
> G.  The defense [ ] called Dr. Jerry Burghout to testify for the Defendant. Although called as a forensic psychologist to establish mental issues with the Defendant, Dr. Burghout is not a licensed clinical psychologist in the State of Florida.  Yet, he offered his opinion as to the psychological problems exhibited by the Defendant.  He even offered a medical opinion that she suffered from fibromyalgia, although he is not a medical doctor.  When asked about PTSD, he said there were things that were observable that would lend itself to that diagnosis, but that he should have ruled that out.  He further testified that he administered no tests to the Defendant.  Although he reviewed

documentation of issues she had in the past, his opinion of her conditions was based upon two two[-]hour conversations with the Defendant. Based upon this testimony, the Defendant argues that her attorney should have argued a mental condition that contributed to the actions of the Defendant, and that she was amenable to treatment in an outpatient setting. The Court gave little weight to the testimony of Dr. Burghout. He was making conclusions and diagnosis that he is not licensed to make. He is not an expert in the field of clinical psychology or forensic psychology, and his opinions regarding the mental state of the Defendant are not acceptable to the Court. Further, the Court does not find that he raised any issues not explored by Mr. Quisenberry or that would have changed the sentence of Judge Fulford. His testimony was of little value.

(ECF No. 42-3 at 61, 69–70).

In her § 2254 petition, Cannon argues that, contrary to the state court's characterization of the purpose of Dr. Burghout's testimony as "to establish mental issues with the Defendant," she presented his testimony "to *confirm what was already clearly established in the record at the time of the sentencing hearing* (i.e., the Presentence Investigation Report)—that Petitioner Cannon suffers from mental health illness." (*see* ECF No. 1 at 47) (emphasis in original). Cannon thus admits that the sentencing court was aware, by virtue of the PSI, of Cannon's mental health disorders and that she was "stable on her medications"; indeed, the sentencing court stated that it read the PSI, and the court referenced Cannon's mental health issues when pronouncing her sentence.

Florida courts apply a two-part analysis for determining the propriety of a downward departure sentence. First, the trial court must determine whether it *can* depart, i.e., whether there is a valid legal ground and adequate factual support for that ground in the case pending before it. *Banks v. State*, 732 So. 2d 1065, 1067 (Fla. 1999). To satisfy the first step, the defendant must present competent substantial evidence to support the departure. *Id.* If the defendant makes that showing, the trial court must then determine whether it *should* depart, i.e., whether departure is the best sentencing option for the defendant. *Id.* at 1068. The court must weigh the totality of the circumstances in the case, including aggravating and mitigation factors. *Id.*

At the time of Cannon's sentencing in December 2011, Attorney Quisenberry also would have been required to prove, by a preponderance of competent substantial evidence, not only that Cannon suffered from mental disorders and that she was amenable to treatment, but also that her mental disorders required specialized treatment that the FDOC could not or would not accommodate. *See State v. Holmes*, 909 So. 2d 526, 528 (Fla. 1st DCA 2005), *disapproved of by State v. Chubbuck*, 141 So. 3d 1163, 1171 (Fla. 2014).[13] Even as late as February of 2014 (four months prior

---

[13] In 2014, more than two years *after* Cannon's sentencing, the Florida Supreme Court resolved a conflict in the district courts of appeal and held that Florida law does *not* require a defendant to prove that the FDOC cannot provide the required specialized treatment, but that the sentencing

to the *Chubbuck* decision), the First DCA held that *Holmes* was binding precedent, although the court found persuasive the opinions of two other district courts of appeal that held the opposite. *See Kinsey v. State*, 135 So. 3d 424 (Fla. 1st DCA 2014).

Here, the state court determined that Dr. Burghout's testimony was of "little value" in showing that the sentencing court would have imposed a different sentence if Attorney Quisenberry had argued for departure under § 921.0026(2)(d). This was a reasonable determination considering the inconsistency in Dr. Burghout's testimony regarding the required treatment for bipolar disorder (he first testified that it was a disorder that was "generally medicated" and later said that it was treated by counseling (*see* ECF No. 42-3 at 15, 23)). Additionally, Dr. Burghout's knowledge of treatment programs available in the FDOC was outdated. He testified that his knowledge of FDOC treatment programs was based upon his experience with the prison system from 1990–1996, which was fifteen years prior to Cannon's sentencing hearing, in December 2011. Cannon thus failed to demonstrate that Attorney Quisenberry could have shown that the FDOC was unable or unwilling to accommodate Cannon's treatment needs.

---

court may consider that fact in deciding whether to impose a downward departure sentence. *See Chubbuck*, 141 So. 3d at 1171.

Moreover, the sentencing court knew it *could* depart downward, at least based upon the evidence of Cannon's remorse presented by Attorney Quisenberry, but the court determined that it *should not* depart based upon the totality of the circumstances in Cannon's case.[14]

A fairminded jurist could agree with the state post-conviction court's determination that Cannon failed to show a reasonable probability that the sentencing court would have imposed a different sentence if Attorney Quisenberry had argued § 921.0026(2)(d) as an additional mitigating circumstance.

Cannon has not satisfied her AEDPA burden of demonstrating that the state court's adjudication of Ground Two was based upon an unreasonable determination of the facts based upon the evidence presented, or that the state court's rejection of her IAC claim was contrary to or an unreasonable application of *Strickland*. Cannon is not entitled to federal habeas relief on Ground Two.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of

---

[14] As noted *supra*, in adjudicating the claims raised in Ground One the state circuit court found "that Judge Fulford at sentencing, found that Mr. Quisenberry had proven a basis for a downward departure by clear and convincing evidence. It is not ineffective assistance on his part that the Court declined to use her discretion to mitigate." (ECF No. 42-3 at 68).

appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336  (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773  (2017) (citing *Miller-El*, 537 U.S. at 327).   The petitioner here cannot make that showing.   Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that

party may bring this argument to the attention of the district judge in the objections

permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the habeas petition (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

3.      That the clerk of court be directed to enter judgment accordingly and

close this case.

At Pensacola, Florida, this 23<u>rd</u> day of April 2021.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**